No. 63,750

*In re* Petition of Robert T. Stephan, Attorney General, to determine the validity of 1989 Substitute for House Bill No. 2492.

(775 P.2d 663)

Opinion filed June 9, 1989.

The opinion of the court was delivered by

MILLER, C.J.: This is an original action commenced by Robert T. Stephan, the attorney general of the State of Kansas, to determine the validity of Substitute for House Bill No. 2492 (L. 1989, ch. 8), enacted by the 1989 Kansas Legislature. The bill reapportions the state representative districts and repeals the statutes which formerly established such districts. For the reasons stated in this opinion, we find Substitute for House Bill No. 2492 valid legislation.

This action is brought pursuant to Article 10, Section 1 of the Constitution of Kansas, which now provides:

"**Reapportionment of senatorial and representative districts.** (a) At its regular session in 1989, the legislature shall by law reapportion the state representative districts, the state senatorial districts or both the state representative and senatorial districts upon the basis of the latest census of the inhabitants of the state taken by authority of chapter 61 of the 1987 Session Laws of Kansas. At its regular session in 1992, and at its regular session every tenth year thereafter, the legislature shall by law reapportion the state senatorial districts and representative districts on the basis of the population of the state as established by the most recent census of population taken and published by the United States bureau of the census. Senatorial and representative districts shall be reapportioned upon the basis of the population of the state adjusted: (1) To exclude nonresident military personnel stationed within the state and nonresident students attending

colleges and universities within the state; and (2) to include military personnel stationed within the state who are residents of the state and students attending colleges and universities within the state who are residents of the state in the district of their permanent residence. Bills reapportioning legislative districts shall be published in the Kansas register immediately upon final passage and shall be effective for the next following election of legislators and thereafter until again reapportioned.

"(b) Within 15 days after the publication of an act reapportioning the legislative districts within the time specified in (a), the attorney general shall petition the supreme court of the state to determine the validity thereof. The supreme court, within 30 days from the filing of the petition, shall enter its judgment. Should the supreme court determine that the reapportionment statute is invalid, the legislature shall enact a statute of reapportionment conforming to the judgment of the supreme court within 15 days.

"(c) Upon enactment of a reapportionment to conform with a judgment under (b), the attorney general shall apply to the supreme court of the state to determine the validity thereof. The supreme court, within 10 days from the filing of such application, shall enter its judgment. Should the supreme court determine that the reapportionment statute is invalid, the legislature shall again enact a statute reapportioning the legislative districts in compliance with the direction of and conforming to the mandate of the supreme court within 15 days after entry thereof.

"(d) Whenever a petition or application is filed under this section, the supreme court, in accordance with its rules, shall permit interested persons to present their views.

"(e) A judgment of the supreme court of the state determining a reapportionment to be valid shall be final until the legislative districts are again reapportioned in accordance herewith."

The petition of the attorney general was filed with the clerk of this court on May 17, 1989, and the court entered an order scheduling a hearing on the petition for Friday, May 26, 1989, commencing at 1:30 o'clock p.m. To provide wide public notice of that hearing, this court directed the clerk of this court to publish a copy of that scheduling order in the Kansas Register and in seven daily newspapers of wide circulation: The Topeka Capital-Journal, The Kansas City Kansan, The Kansas City Times, The Wichita Eagle-Beacon, The Salina Journal, The Pittsburg Morning Sun, and The Garden City Telegram. Interested persons were invited to file written statements in support of or in opposition to the proposed reapportionment, and to request oral presentations if they wished to make them.

There were six written statements filed, five opposing the proposed reapportionment and one supporting it. The following opposed the legislation:

Patricia R. Hackney and Robert W. Fairchild, of Riling, Burk-

head, Fairchild & Nitcher, Chartered, of Lawrence, on behalf of Board of County Commissioners of Douglas County, Kansas, Board of County Commissioners of Riley County, Kansas, Board of County Commissioners of Leavenworth County, Kansas, City of Lawrence, Kansas, City of Manhattan, Kansas, Wint Winter, Betty Jo Charlton, John Solbach, Jessie Branson, Timothy Miller, Robert K. Georgeson, Ben Zimmerman, Mary Thomas, Richard M. Kershenbaum, Michael J. Schreiner, Frank P. Bustamante, Marc J. Lebeau, Sheila Hochhauser, Lana Oleen, Katha Connor Hurt, Jouet (Joe) E. Arney, Valarie Hooper, Phil Martin, and Delbert Gross;

Christoper K. McKenzie, Douglas County Administrator, of Lawrence, Kansas, on behalf of the Board of County Commissioners of Douglas County, Kansas;

Wilton B. Thomas, Chairman of the Board of County Commissioners, of Manhattan, Kansas, on behalf of the Board of County Commissioners of Riley County, Kansas;

Harold T. Walker, city attorney, and Henry E. Couchman Jr., assistant city attorney, of Kansas City, Kansas, on behalf of the City of Kansas City, Kansas; and

Representative LeRoy F. Fry, of Little River, Kansas, state representative for the 105th district of Kansas.

A written statement and brief in support of the reapportionment legislation was filed by Robert A. Coldsnow, of Topeka, Kansas, legislative counsel.

Oral presentations were made to the court by Robert T. Stephan, attorney general; Patricia R. Hackney, Lawrence, Kansas; Christopher K. McKenzie, Lawrence, Kansas; Wilton B. Thomas, Manhattan, Kansas; Henry E. Couchman Jr., Kansas City, Kansas; and Robert A. Coldsnow, Topeka, Kansas. Representative Fry did not request time for oral presentation in his written statement, and did not appear in person at the hearing.

Extensive oral arguments were held. Thereafter, the court admitted the many exhibits and made them a part of the record before the court. Upon consideration of the matter, we examine the petition, the written statements, the briefs which have been filed, and the exhibits, and we take judicial notice of other relevant official records.

Additionally, a written statement opposing the proposed reapportionment from the Board of County Commissioners of Leav-

enworth County, Kansas, John A. Junk, Chairman, Edward E. Powers and Kevin E. Reardon, members, was sent to the clerk of this court by Federal Express on May 23, 1989. Unfortunately, that document was misdelivered and was not received and filed by the clerk of this court until Tuesday, May 30, 1989. That document has been distributed to all of the members of this court and was considered in arriving at a decision in this proceeding.

In determining whether the act is valid, the court must examine the procedure by which the act became law, and must also examine the substance of the apportionment act to determine that it satisfies constitutional requirements. See *In re Senate Bill No. 220*, 225 Kan. 628, 632, 593 P.2d 1 (1979), and *In re House Bill No. 2620*, 225 Kan. 827, 841, 595 P.2d 334 (1979).

The procedure by which the act became law, contained in the House and Senate Journals, is not challenged in any of the written responses, nor was it challenged during oral argument. House Bill No. 2492 was introduced on April 26, 1989, by the Committee on Legislative, Judicial and Congressional Apportionment. It was amended by substituting a new bill, designated as "Substitute for House Bill No. 2492," on the same date. A special report of the Committee on Legislative, Judicial and Congressional Apportionment accompanied Sub. H.B. 2492. A motion by Representative Hank Turnbaugh to amend the bill did not prevail.

Also on April 26, 1989, on motion of Representative Robert H. Miller, an emergency was declared by a two-thirds vote of the House, and Sub. H.B. 2492 was advanced to final action. It was passed by the House on the same day by a vote of 97 to 27, one member not voting.

Also on the same day, on motion of Senator Fred Kerr, an emergency was declared by a two-thirds vote of the Senate, and Sub. H.B. 2492 was advanced to final action. The bill was passed by the Senate by a vote of 32 to 7, with one member absent.

Subsequently, the bill was signed by Governor Mike Hayden on May 2, 1989, and was published in the Kansas Register on May 4, 1989. The procedure by which the bill became law appears to comport with all constitutional requirements and we find no procedural deficiencies.

All of the persons appearing in opposition to the bill, with the exception of Representative Fry, whose position we will discuss

later, object not to the proposed reapportionment, but to the validity and constitutionality of the 1988 census upon which the reapportionment act is based. They do not object to the division into districts made by the act, nor do they object either to the configuration of the districts or to the deviation from the ideal district population. Rather, their objection goes to the 1988 census, which underlies the entire reapportionment act. They contend that the census is inaccurate, that it is seriously flawed, that the statutorily mandated methodology by which the census was taken and the presumptions of places of residence contained in K.S.A. 1988 Supp. 11-205 are unconstitutional, and that the 1988 state census violates the rights of military personnel, college and university students, and certain minority groups. Moreover, they contend, if that census is used as a basis for reapportionment, it will result in underrepresentation for certain counties and cities and for the designated groups, and it will deny them fair and equal representation.

Direct attacks upon the validity of the 1988 state census, upon grounds similar to those made here, are being made in three pending lawsuits. They are: *Board of County Commissioners, et al., v. Mike Hayden, Governor, et al.,* Case No. 88-CV-1953, filed November 30, 1988, in the District Court of Shawnee County, Kansas; *The City of Kansas City, Kansas, et al., v. Mike Hayden, Governor of the State of Kansas, et al.,* Case No. 89-CV-206, filed February 7, 1989, in the District Court of Shawnee County, Kansas, which action was on April 5, 1989, consolidated with Case No. 88-CV-1953; and *Board of County Commissioners of Douglas County, et al., v. Mike Hayden, Governor, et al.,* Case No. 88-4284-O, filed in the United States District Court for the District of Kansas on November 30, 1988. We are informed that discovery has commenced in one or more of those actions but is not completed; trials have not begun and no judgments have been entered.

Article 10, Section 1 of the Constitution of Kansas requires that the legislature, at its regular session in 1989, reapportion either the state representative districts or state senatorial districts, or both, "upon the basis of the latest census of the inhabitants of the state taken by the authority of chapter 61 of the 1987 Session Laws of Kansas."

Chapter 61 of the 1987 Session Laws has now been codified

and and the pertinent sections appear as K.S.A. 1988 Supp. 11-204 to -208, inclusive. This is the legislation under which the 1988 state census was conducted. No other census has been taken since 1980, the date of the last federal census. There is no alternative census upon which the legislature could base its reapportionment.

A court may generally rely upon either a state or federal census. The information contained in them is presumed to be accurate and is prima facie correct until proven otherwise. In *Latino Political Action v. City of Boston*, 568 F. Supp. 1012 (D. Mass. 1983), the plaintiffs challenged the apportionment of the City of Boston for city council members and school committee members. The city, in drawing district lines, had relied upon a 7-year-old state census rather than a 2-year-old federal census. The variance of population between the districts, using the old state census data, was 8 percent, while under the newer federal census the variance increased to 23.6 percent. Assessing the city's decision in light of the requirement that a good faith effort be made to construct districts as nearly of equal population as practicable, the court found the action impermissible. The court cited several cases supporting the proposition that the most recent census is the most reliable and is generally required in legislative apportionment plans.

*Latino* is particularly applicable here because the federal census, the use of which the *Latino* plaintiffs sought, was being challenged in other court actions. The court disposed of that issue as follows:

"Defendant contends that the federal census is not accurate, and bases this contention on the fact that the federal census is presently under attack in various federal courts throughout the country, including the Massachusetts Court. To date there has been no successful legal challenge of the 1980 federal census. See, *Carey v. Klutznick*, 653 F.2d 732 (2d Cir. 1981) (rejected challenge to federal census); *Young v. Klutznick*, 652 F. 2d 617 (6th Cir. 1981) (same). Although Boston is challenging the more recent federal census in court, the filing and mere pendency of a lawsuit proves nothing. The federal census is presumed accurate until proven otherwise and is, therefore, the most recent and accurate measure of population before the Court today. See *Kirkpatrick v. Preisler*, 394 U.S. 526, 535, 89 S. Ct. 1225, 1231, 22 L. Ed. 2d 519 (1969) (high degree of accuracy required to supplant population figures of prior decennial census); *Graves v. Barnes*, 446 F. Supp. 560, 568 (W.D. Tenn. 1977)(same); *Dixon v. Hassler*, 412 F. Supp. 1036, 1040 (W.D. Tenn. 1976) (decennial figures controlling unless clear, cogent, and convincing evidence that they are not valid)." 568 F. Supp. at 1018.

In *McNeil v. Springfield Park Dist.*, 851 F.2d 937 (7th Cir.

1988), plaintiffs challenged the use of the 1980 federal census. The court said:

"The census is presumed accurate until proven otherwise. *Latino Political Action Comm.*, 568 F. Supp. at 1018. Proof of changed figures must be clear and convincing to override the presumption. *Dixon v. Hassler*, 412 F. Supp. 1036, 1040 (W.D. Tenn.)(three judge panel), *aff'd sub nom. Republican Party v. Dixon*, 429 U.S. 934, 97 S. Ct. 346, 50 L. Ed. 2d 303 (1976).

"[T]he meager evidence before us cannot override the presumption of census accuracy. In any event, if the plaintiffs' view of the population trends is correct, they will have a good claim based on the 1990 census." 851 F.2d at 946.

See *Rauch v. Metz*, 212 S.W. 357 (Mo. 1919); *Armbrecht v. Thornburg*, 137 W. Va. 60, 70 S.E.2d 73 (1952); 14 Am. Jur. 2d, Census § 10; and 14 C.J.S., Census § 2.

Here, as in *Latino*, the census has been challenged but has not been invalidated. We are given a special task by the Constitution of Kansas: to determine, within a short time, the validity of an act of the Kansas Legislature reapportioning state representative districts. The Constitution directs that the reapportionment be based upon the latest census taken by authority of chapter 61 of the 1987 Session Laws of Kansas. Determining the validity of the 1988 census, upon which the reapportionment is based, is a formidable task and one which may not be attempted in the limited time available to us. We presume, for the purposes of this action alone, that the census is accurate and valid. We leave that determination to the trial courts in which actions challenging the 1988 census are pending. If plaintiffs in those actions are successful in challenging the 1988 state census, they are not without remedy to then challenge legislative apportionment by an appropriate action in state or federal courts. We cannot delay our decision in this case until the validity of the 1988 census is determined in one or more of the pending actions; we must act within 30 days of the filing of the petition.

Representative Fry contends that the reapportionment act violates the guidelines adopted by the House committee which proposed it, in that the districts are not compact and contiguous, the identity of existing political subdivisions (counties) was not preserved, political considerations prevailed over stated reapportionment objectives, and the committee could have avoided splitting counties and could have placed more counties entirely in a single district.

As the United States Supreme Court stated in *Reynolds v.*

*Sims*, 377 U.S. 533, 567, 12 L. Ed. 2d 506, 84 S. Ct. 1362 (1964): "Population is, of necessity, the starting point for consideration and the controlling criterion for judgment in legislative apportionment controversies." See also *In re House Bill No. 2620*, 225 Kan. at 830, where we said: "The constitutional principle underlying reapportionment litigation is founded on the Fourteenth Amendment equal protection concepts. It requires that one person's vote in an election be worth as much as another person's vote as nearly as district population apportionment will permit."

None of the persons appearing here challenge the apportionment legislation now before us on the basis that it dilutes the vote of rural or urban voters, or other specific groups of voters, or that the districts created deviate impermissibly from the "perfect" population. The census upon which this legislation is based shows the total population of Kansas to be 2,293,445 persons. Dividing that sum by the total number of districts, 125, we find that the perfect or ideal district would contain 18,348 persons. The average deviation of the population of the districts created by Substitute for House Bill 2492 from that of the ideal population is less than 3%. The most populous district is the 95th Representative District, located entirely within the City of Wichita, with a population of 19,317, or 5.3% above the ideal. The least populous district is the 9th Representative District, consisting of all of Allen County and a portion of Anderson County, with a population of 17,482, or 4.7% below the ideal. The total deviation between the largest and the smallest district is 1835 persons, or 10% of the ideal district population. Representative Fry's district, the 113th, has a population that is 643 persons, or 3.5%, above the ideal, an insignificant variation.

In *Gaffney v. Cummings*, 412 U.S. 735, 37 L. Ed. 2d 298, 93 S. Ct. 2321 (1973), and *White v. Regester*, 412 U.S. 755, 37 L. Ed. 2d 314, 93 S. Ct. 2332 (1973), the United States Supreme Court held that minor population deviations do not establish a prima facie constitutional violation. The deviations in those cases were 7.83% and 9.9%, respectively. In the more recent case of *Brown v. Thomson*, 462 U.S. 835, 77 L. Ed. 2d 214, 103 S. Ct. 2690 (1983), the United States Supreme Court approved a plan with an average deviation of 16% where the deviation resulted from adherence to county boundaries. Discussing permissible popu-

lation deviation in *In re House Bill No. 2620*, 225 Kan. at 832, we said:

"A 5% deviation over and a 5% deviation under the ideal district population appears to be the line drawn by the federal courts. If the total maximum variation is over 10%, proper justification for such a variation appears to be necessary. Justification may be established by showing that the variations came about as a result of some rational state policy, such as the use of high population precincts, natural boundaries or physical barriers."

See also *Winter v. Docking*, 373 F. Supp. 308 (D. Kan. 1974), where that court recognized that minor deviations in population of the districts needed no justification, and larger deviations were permissible when resulting from implementation of a rational state policy. The deviation here was minor, a maximum of 10%, and needs no justification.

Here, the legislature used as "building blocks" the voting precincts within cities and the townships outside the cities. The voting precincts within the City of Wichita are quite large, resulting in the excess population found in the 95th Representative District. There is no suggestion that population deviation in Sub. H.B. 2492 was designed to dilute the voting strength of persons in any cognizable group or locale, or that it has the effect of discrimination, under the only census figures available to the legislature. Under the circumstances disclosed herein, we conclude that the reapportionment plan is not unconstitutional based upon population deviation.

We now turn to the contention that Sub. H.B. 2492 does not establish districts which are compact and contiguous. The 105th Representative District, Representative Fry's present district, established in 1979, consists of all of Rice County, approximately the south three-quarters of Ellsworth County, and approximately the west one-fourth of McPherson County. See K.S.A. 4-3,305. His new district, the 113th, consists of approximately the east half of Barton County plus the north half and the southeast quarter of Rice County. Included are two precincts in the City of Great Bend and the City of Hoisington in Barton County, and all of the City of Lyons in Rice County. That portion of Ellsworth County which he formerly represented is now included in the 67th Representative District, which has 25 persons above the ideal. The southwest quarter of Rice County, formerly in the 105th District, is now included in the 101st Representative District, which has 84 persons above the ideal population. The

113th Representative District now extends further from east to west than did District 105, but it encompasses portions of only two adjoining counties rather than three. The district is traversed by U.S. Highway 56, running from east to west. District 113 is fairly contiguous and compact when compared with many districts created by both the 1979 and the 1989 reapportionment acts.

There are six representative districts created by Sub. H.B. 2492 which pit incumbent against incumbent, or more properly, in which two representatives presently reside. In three districts, both are Democrats; in one district, both are Republicans; and in two districts, one is a Republican and one is a Democrat. When the state is redistricted, it is inevitable that some resulting districts will include the residences of more than one incumbent. That fact, however, does not indicate or demonstrate a pattern of invidious discrimination.

It is argued that the legislation does not preserve the identity of political subdivisions, particularly counties. We find only one district, Representative District No. 121, which consists of three counties, with all district lines running on county lines. That fact alone, however, does not vitiate the act. As with the 1979 acts reapportioning both the Senate and the House, the legislature has used voting precincts in urban areas and townships in rural areas as building blocks in carving out the representative districts. See *In re House Bill No. 2620*, 225 Kan. at 832-33. There is no claim here that the districts were organized in such a way as to impair the voting strength of racial, political, or other indentifiable segments of the voting population, and we find no indication that such was the purpose or will be the effect of the act. Approximately half of the counties remain wholly within one representative district. Those counties which are divided appear to have been divided because of population considerations, not because of any improper motive.

The committee report which accompanied Sub. H.B. 2492 discussed the guidelines for reapportionment which the committee developed and used. Of particular interest here is the following portion of the committee's report:

"Districts should be as compact as possible and contiguous.

"In working with this criterion or guideline the Committee took into account the availability and facility of transportation and communication between the people in a proposed district, between the people and candidates in the district

and between the people and their elected representatives. Compactness is limited by variances caused by the shape of counties, census enumeration units (i.e. precinct and township lines), natural boundaries, population density, and the need to retain compactness of adjacent districts. The compactness of each House district must be related also to the overall approach used in developing districts of population as equal as practicable. Most of Kansas exhibits a settlement pattern characterized by relatively densely populated areas interspersed within very sparsely populated areas which contributes to the difficulty of drawing districts in a compact manner. Wherever feasible in the plan contained in this bill, districts within densely populated areas have been drawn as compact as possible. However, in many instances this necessitated drawing other districts in the vicinity of such densely populated areas which give an appearance of noncompactness."

Though we might have drawn district lines differently, we cannot substitute our judgment for that of the legislature.

We turn now to the claim that political considerations prevailed over stated apportionment guidelines. The committee recognized, as one of its guidelines, that districts should not be drawn to protect or defeat an incumbent representative, and it also recognized that reapportionment inevitably has sharp political impact. Changes in district lines will pit some incumbents against others. Of the twelve incumbents who have been placed in districts with other incumbents, only one objects to the present plan. In *In re House Bill No. 2620*, 225 Kan. at 840, political considerations were discussed. We quoted from *Gaffney v. Cummings*, 412 U.S. at 753:

" 'Politics and political considerations are inseparable from districting and apportionment. The political profile of a State, its party registration, and voting records are available precinct by precinct, ward by ward. These subdivisions may not be identical with census tracts, but, when overlaid on a census map, it requires no special genius to recognize the political consequences of drawing a district line along one street rather than another. . . . Redistricting may pit incumbents against one another or make very difficult the election of the most experienced legislator. The reality is that districting inevitably has and is intended to have substantial political consequences.' "

The plan here adopted may have adverse consequences for incumbents who are pitted against each other; any plan would, although alternate plans would affect different legislators. The mere fact that the plan pits incumbents against incumbents furnishes no reason for a court to invalidate the legislative plan. We find no invidious discrimination and no reason to reject the legislation on this ground.

Finally, it is contended that "a more coherent legislative map

can be drawn with compact, contiguous districts which unite more counties into a single district." The fact that other plans could be devised which might avoid dividing certain counties into two or more districts does not give us cause to reject the plan adopted by the legislature. Again, we cannot substitute our judgment for that of the legislature.

We conclude that Substitute for House Bill No. 2492 does not violate the Constitution of the United States or that of the State of Kansas. Judgment is entered upholding the validity of Substitute for House Bill No. 2492.